Your Honor, this is the first case in the morning call. 2-08-3416, the state of Illinois v. Peter Hommerson. On behalf of the appellant, Ms. Kathleen Campbell. On behalf of the appellant, Mr. Edward Sanford. Good morning, Your Honor. I'm Kathleen Campbell on behalf of Peter Hommerson, the defendant appellant. May it please the court, we raised three issues in our brief and I want to try to address them all. But this is a very fact heavy case and I'm not quite sure how this is going to go so I'm hoping that your questions will guide me. Please direct me if you want me to stop whatever I'm doing. My first issue is whether or not the defendant was proved guilty beyond a reasonable doubt by circumstantial evidence. The second and third are our contention that the defendant would not have been convicted had the evidence of violation of the marital privilege not been presented to the jury and also had numerous false and misleading statements not been made by the prosecutors in their closing arguments. I'll start leaving you a bit at first. Why doesn't the testimony of I think it's Roz or Mrs. Hommerson not fit one of the exceptions? Because I believe the exception that you would probably be thinking of would be the kind of a co-conspirator sort of exception. Or agent. I would say because there is absolutely no indication whatsoever that she in any way participated in any crime, including obstruction of justice or, you know, helping facilitating the escape of a of a wanted person or anything because the defendant was simply questioned prior to his decision to go to Mexico. He had never been charged. She knew when he asked her to make certain statements that those statements weren't correct. And she did make those statements. Isn't that correct to the police? She did. Yes. All right. And so she but and it's probably also true that she didn't know what had actually happened when she agreed to make those statements. Correct. Yeah. However, there was a there certainly was a possible expulpatory explanation for the defendant's desire to have a false alibi. And that being simply that he probably recognized that what happened to the Whitman's happened on a morning, a day on which in the morning he had been at their house and that he whatever he was doing during the afternoon. And I readily concede that the defendant's activities, the accounts of his activities during the afternoon are unsatisfactory. We don't know where he was. And he's never really he's given conflicting or not conflicting, but just simply different explanations for his activities in the afternoon. So whatever it is he was doing, he apparently didn't feel he could account for where he was. Just to clarify, it's not really a co-conspirators exception that was carved out in a Saunders case. It's a exception of she and the wife would be acting as an agent at the time for him, something that was not for the mutual benefit. That's something. So the conversations relying on those activities would not be considered privileged, arguably under Saunders, because she was acting at his behest and as an agent for him, irrespective of whether or not there was some criminal activity. And I'm not suggesting there was. So it doesn't have to be part of a criminal enterprise to get past the privilege, does it? I believe it does have to be part of a criminal enterprise. It has to be something where she is acting as his agent for purposes that are contrary to the interests of society. On what authority are you drawing that in? It is my reading of Saunders. I don't think that – and Hall. A good example – the cases in which the privilege does not apply, where there's an exception, is where the spouse is directed to do something or another to help with the commission of the offense. And that simply is not what she did here. Here she simply helped him go to Mexico. On your theory, then, the spouse then would have to be subject to some criminal liability in order for this privilege to apply? Because that seems to be what you're saying. They're involved in some kind of criminal activity. Yeah. I guess that is what I'm saying. Would you read Saunders to stand for that proposition? I do. I do. I think that the defendant – I mean, here what we have is basically as far as she – as far as we know she knows, the defendant had nothing to do with this crime. Right. Because we have no evidence whatsoever that he ever told her that he did. And so, you know, we have no – I mean, quite often this privilege comes up where the defendant actually confesses to his spouse. But here we have nothing like that. We simply have him saying, I know the Lichtmans, you know, this terrible thing happened, and I want you to, you know, say I was with you on that afternoon. And then we have her saying – you know, him saying, I'd like to go to Mexico after they have every reason to believe that he's become a crime suspect. And if he didn't do it, his position would be absolutely terrifying for both of them. And so it would be a logical thing to do. These are people who were, you know, refugees from Hungary and supposedly political refugees, which Raz also testified to. So just to summarize, you're saying that the privilege should not be pierced, why? Because there's no showing she was part of a conspiracy? Because at the time that this happened, the only conspiracy there would be would be to help him go to Mexico because he fears that he is going to be charged or that he is a suspect. And that in and of itself is not illegal. So basically you're saying none of the conversation should have come into this. Is that your position? Well, no. I acknowledge that the privilege does not apply to anything that Raz herself observed or experienced. And so actually as far as the flight and the alibi go, a lot of it still would be able to come in, I admit. And that would be she could say, I told the police such and such, and that was not true. Will we expect any communications or conversations, you're saying, of the privilege? Yeah, all she'd be able to not say is he told me to say stuff that isn't true and he told me to take him to Mexico. She could say we went to Mexico, but not that she, you know, and really those parts, because there would be some of it that we don't think that's the most damaging part, although it certainly is damaging to let the jury know that those things were his idea, because they could conceivably conclude that it was her idea. She has a spouse. They've been married for 18 years. They apparently had a good relationship. Rather, it's those phone calls that we think really served no purpose other than to prejudice the defendant. And, you know, him calling her at 6 a.m. on the morning after this event at the Lickmans and saying that something terrible had happened and that he couldn't talk about it on the phone. And then at 10.30 saying that he's arrived in Springfield or is on his way to Springfield and that he believes the police may come and try to talk to him. And, you know, things of that nature, that these were all things that could be interpreted as consciousness and guilt. And we do acknowledge that this is true, although, of course, they also could be interpreted, as I say, as consciousness, that he could be a suspect. But either way, it really was privileged and it is just totally remiss of defense counsel that he did not object. And had he objected, we say that it would have been excluded. So as it relates to either plain error or ineffective assistance of counsel, you're saying you're basing your argument on the closeness of the evidence. Yes. And plain error, we know from Hall that it's not a fundamental issue, correct? Right. In fact, at Hall, they actually said that oppositely rather than undermining the reliability of the evidence, that this sort of evidence is probably particularly reliable because people are inclined to confide in the spouse. And we wish to have a society in which one can feel totally free to do that. And so that's right. It would be regarding the closeness of the evidence. Are you saying that because it's a circumstantial evidence case, it's close? Or are you simply arguing the facts of this case? I mean, can you think of a circumstantial evidence case that would not be close? Well, yeah, I believe it's conceivable that you could have a close circumstantial evidence case. In this case, the circumstantial evidence is outrageously poor, outrageously weak. There is virtually none. All that we really have is that this fire occurred at 7.38 p.m. and that most of the house was destroyed. And in the ruins, they find the remains of the Littmans. There is a little ballistic evidence. There are some casings. There are some bullet fragments inside of the bodies. But the fire has mutilated the casings to such an extent that all they can determine is that there are 22s. And there is a stamp that indicates that the brand of the ammunition was Winchester Western Supreme Axe, which the firearms expert for the state testifies is an extremely common brand of ammunition. And, of course, a .22 is one of the most common guns. And there are thousands of them. But you seem to be saying, because the time is limited, that the evidence linking him, the direct evidence linking him to the offense is not very strong. It's nonexistent. What about the testimony that the jury would take into consideration? What do you make of the fact, or how do you assess the fact, that allegedly he told a number of lies? He rented a van. He said that he rented a van and purchased facts. He gave inconsistent statements as to why he rented the van. He told the police he didn't own a .22 caliber firearm when it was shown he had purchased and possessed such a firearm. Ammunition was found in his basement, .22 caliber. So he said some things that admittedly were contradictory. So that's got to be taken into consideration by the trial effect, isn't it? Well, up to a point, except that if you look at, like, for example, the van, it's truly, he told very unsatisfactory stories about the van. There's discrepancies in mileage. There's a lot of things wrong with his van testimony. The problem is that a van is never connected to this crime whatsoever. So it's kind of a dead end evidentiary-wise. I mean, if they show that whoever killed them definitely used a budget van, then he would have a serious problem with his life. There would be an inference to kill. But here there's no inference. It's just that he doesn't want to tell anybody where he was or what he was doing with the van. It's that simple. But since he was a handyman, and here's the connection. Since he was a handyman working for them on occasion, it's presumed that people would know his vehicle. So he would not want to go back to the house in his own vehicle. And the budget van now is making some sense. Well, there's two very big problems with that, though. I mean, one of them is, you know, as far as the van's presence at the house, is that we do not know the time of death anywhere, nothing at all about the time of death of these two people, other than that Caleb had made a telephone call at 1142 a.m. and that her remains were found in this fire that started probably about 730, according to, I believe, the alarm expert testified to that. The alarm went off at 730, but it's heat-sensitive, so there's a little gap. As to Marvin Lichtman, 415 p.m., when the limousine driver dropped him off, and we know nothing after that. And so all we know is that the defendant himself told the police that he rented and explained that he did so because he had left the house in the morning. He went and did a few things, including getting this van, and then he came back intending to do more work on this project that he had been hired to do by the Lichtmans. And he said that there was nobody home, correct, as I recall? Didn't he say there was nobody home? Yeah, he said nobody was home, and then he waited in the driveway to see if she would come home. That's a reasonable explanation. We have no reason to think that we have no evidence that he got into the house or that he. . . What do you make of this van from Lichtman's home that was found in his van, his work van? The vase? Yeah. Well, he had, again, he had an explanation for that. It was simply that the vase had been given to him by Mrs. Lichtman to copy a pattern off it and indeed has a kind of an interesting floral pattern on it, according to the picture of it, to etch into this dress that she would be wearing in this sculpture that he was preparing for them. It's a reasonable explanation. There's no evidence that that vase was worth a bazillion dollars or a few cents. And so there's, you know, given that explanation, given the fact that he was somebody who had been doing glasswork for them for like 12 years, he had them engaged to do an etching that included a garment on Mrs. Lichtman, and that, you know, this is not an unreasonable explanation. Let me ask you this. Is the standard under review, is the test for determining the deficiency of the evidence on appeal any different for a circumstantial evidence case than it is for direct evidence? No, it is not. It is identical. And we realize that we are fighting an uphill battle here, but we do ask this court to really look at what happened here. And I do want to say one quick thing about the possession of the gun. They did not really prove that the defendant possessed a .22 at the time that he said that he didn't possess a .22. They proved that he had purchased a .22 in March of 1994 and that he still had it in maybe January of 1995. But they also proved by their own evidence that his wife was periodically running guns to hungry. She said she usually only brought rifles, but when they asked her, did you ever bring a handgun, a .22, she simply didn't recall. So there's one possible explanation. He could have lost it. What about the evidence of flight? How does that factor into this? Evidence, it's certainly the case that the law allows an inference to be drawn from that, but it is not proof beyond a reasonable doubt. And when you have nothing else except for aberrant behavior after the event, you don't really have proof of guilt. And one of the, you know, I'd quickly like to just make the point that this plays into our last argument, the many, many things that the State said during his closing argument, which was really not based on the record, which really was just speculation. And one of those things was his, you know, the argument that if you have nothing other than the fact that the defendant realized he was so guilty that he fled the country and everything and left everything behind, then you have enough to convict him. And that is not the law. And yet that is probably what lay people are highly likely to think. In fact, we have a juror who had to leave this case at the beginning because she realized she recognized this defendant from America's Most Wanted and had concluded upon hearing about his flight that he was guilty. That was the danger in this case. There was just so much drama and glamour in this case and very, very little evidence. You cite Blue in that part of your argument for the proposition that the forfeiture rule is relaxed on a closing argument issue. Do you have any other cases other than Blue that you found that show the relaxation of the forfeiture rule? I cannot name any right off the top of my head. I know that they exist. I could supplement my brief with that if you would like me to. I was just wondering if you had any. No, I'm afraid I don't. It's kind of a general truth. Here, what were the evidence? I believe that the state more or less fabricated a motive for the defendant. There was no motive, no real evidence of any motive. They thought he needed money. But the only evidence they put out regarding his financial condition was his wife's testimony, which was that they were in very good shape. We should all be in such good shape. She had a good income. She's a shoe designer. If you Google her, she's very famous. They had two houses. They had 800 acres in Europe. They had just a lot of possessions and stock and cash. They had retirement funds and stuff. And on top of it, and the really glaring thing about the motive business, is the fact that when they looked at the fire scene afterwards, they found $11,000 in cash lying on the floor of the foyer of that house. I think that circumstance all by itself gives rise to a very strong inference that whoever killed the victims did so for a motive other than money. No such non-monetary motive could even be suggested on this record. There was nothing at all. The state didn't even try to come up with one. So, you know, we have this, and yet, in closing argument, the state kept saying that that was the problem. In fact, they violated a court order and argued substantively that the defendant had taken out a $40,000 loan that he'd never repaid, as though that was evidence of his financial problems in 1996 when his wife said they were debt-free, and also when his wife was a hearsay violation. She was the only source on this loan. His wife said that the loaner was his business partner, was the defendant's business partner in the very business that this loan was supposed to have been made to shore up. And so whether you can even call that a loan is questionable. But nevertheless, in closing argument, the state said, we know that he was lying when he said that they lie when they say that they're financially okay because we know about this loan. And that just simply wasn't true. The ballistics evidence was grossly, grossly overstated. They said that the casing found in the basement matched the casing that was found at the scene, and all that it really matched was that they were both this Winchester Western ammunition. This was kind of like if they had found a Pepsi can at the scene and then had found that the Harrisons had a case of Pepsi in their refrigerator, to say that connected him with the crime scene would be observed because it's simply too common of an object. And the same thing is true with these casings. They are simply too common. So what we really have is a manufactured motive. We have no real ballistic evidence, and we really don't have any opportunity to commit the offense that was proved only because we don't know when the offense was committed. We have no evidence regarding the time other than the time of the fire at 738, or the alarm, which is a cutoff time. It had to be all that had happened before that. All right. You will have an opportunity for rebuttal. Thank you. Okay. Okay. Thank you very much. Counsel? Your Honors, may it please the Court. Counsel. My name is Edward Pisanthi, and I represent the people in this matter. If I could, I'd like to address the points addressed by my opposing counsel in reverse order. To the best I can, I'm going to do that. She mentioned a few things about prosecutorial misconduct as she was closing, and basically it was the comments upon the strength of the evidence. And I think I addressed all those things satisfactorily in the brief, but if I could just emphasize a couple points. The comment that him fleeing, the defendant fleeing to Mexico was enough to convict him, that's not what was said. What was said, it was enough to convict him of being placed at the scene. In my mind, it's obvious that that was some sort of misstatement, or some sort of transcription error on the part of the, it didn't make sense. The statement in itself didn't make grammatical sense. So it was either a transcription error or a misstatement by the closing attorney, and it was never repeated. And that's true of all the comments regarding prosecutorial misconduct. They're mentioned one or two times, and none of them were objected to, so they're all forfeited. They're all subject to forfeiture. But the fact remains, if you look at blue, which is our sum of authority here, this is a very, as counsel stated, kind of a spectacular case. And these are rather emotional, almost, you know, loose-ended, you figure, you know, take it from here type thing. And that's not really what the argument is supposed to be. It's supposed, is an argument supposed to make inferences or allow inferences to be made from the evidence and not to say this is what the evidence says? I think if you read the closing arguments in context, which you need to do when you review prosecutorial misconduct claims, the closing attorneys didn't ask the jury to use their wild imagination to come to conclusions. They argued the facts that were in the record and the reasonable inferences from those facts. For instance, on the financial condition of the defendant, which opposing counsel mentioned, she failed to mention that the defendant had also borrowed $70,000 from his wife and had not paid that back. And that fact is important for two reasons. It showed that he was personally experiencing financial troubles, and two, that this couple, for whatever reason, kept separate finances. His wife may have been doing well. He wasn't. His business was bankrupt. There was a tax lien on his business. He was working out of his home, and he had an outstanding loan, properly admitted as evidence, to his wife for $70,000 that he had not repaid. Those are all facts of record, and inference could be drawn from those facts. So how did he benefit financially from the murders? You know, it's hard to say. I understand financial money. I don't know if you could tie that into that he took something valuable from the house or there was some financial benefit. I'm wrestling with tying that argument up. He was in dire financial straits with a motive for the crime if there's nothing taken. But insofar as we're going into the sophisticated evidence and leaving a posterior on misconduct, you have to look at all the facts. Reasonable inferences could be drawn that he rented a van, which he didn't want to be recognized. He yelled at or he had a disagreement with the rental clerk about getting a van that had budget on it. He wanted a plain white van that he had seen previously. That's in the record. He went to a box store and ordered more boxes than they had and asked for more boxes than they had in stock. They couldn't fill his order. He wanted so many boxes. And he lied about why he needed that stuff. A reasonable inference could be that this house, which you'll see in the video, was chopped absolutely to the gills with statues and art and vases, not unlike the vase that he had in his van after the murders. But none of which disappeared from the home following the murders. That's impossible to deduce because of the fire. We have no idea what could have been missing. But nothing that would link him in court to the offense in terms of possession of stolen items, correct? The vase. Other than the vase. That's all he still had in his possession. That's true. That's true. As far as ballistic evidence in terms of prosecutorial misconduct, counsel's right that the defendant did possess the exact same type of Winchester ammunition that was used to kill the victims in this case. And for someone who didn't own a .22, he had ammunition for the .22. But not only that, the spent casing that was found in his basement was identical in class characteristics to the casings found at the murder scene. And you have to understand, these casings, they had to sift through all this rubble and char things in the house. And the water from the water hoses froze these casings to the floor. So it's a miracle that they were recovered at all. And when they were recovered, they were able to match the firing pin mark and the ejector mark of the casing found at the scene to the casing found in the defendant's basement. And that was enough to limit the number of weapons that could have fired these particular bullets to a handful, four or five different weapons. It wasn't simply a matter of the same type of caliber found in his basement versus the scene. You're saying that the casings matched the one that was found in his basement. Right. And not to such a significant degree that they could say it's the exact same weapon. But it narrowed the number of what? To four or five that were mentioned by the ballistics expert. So that was not an overstatement of that. One of which was the Ruger. The Ruger that he purchased in March of 1994 and which he still had a clip for when they searched his house and which he still had ammunition for when they searched his house. You know, if we found more weapons, this wouldn't even be an issue. Counsel began at the court's direction talking about the marital privilege, and I'd like to touch on that a bit. I think the Saunders case fairly clearly states that if a couple is involved in a joint criminal enterprise that there's an exception to the marital privilege. You're making the argument. I'm a little surprised you're making that argument. Does it have to be a joint criminal enterprise? That's the term used in Saunders, but it may not necessarily be that narrow, but we have that here because defense counsel admitted below. He admitted that the wife could be charged with obstruction of justice for lying to the police at the behest of the defendant. Defendant asked her to do it. She did it. That's obstruction of justice. That's enough. The privilege is gone under Saunders. I thought Saunders adopted Cranco, which said that there is no recognized joint criminal enterprise exception to the marital privilege. And then Saunders went on to apply a general agency exception not tied specifically to a joint criminal enterprise. You know, Your Honor, I apologize. I may be missing the point. I may have misspoke there. Joint criminal column, as far as the joint criminal enterprise, you're right. It was in the Cranco case, but as it was applied in this case, I'm sorry, in Saunders, it was used for arguably a joint criminal enterprise. What happened was the defendant asked his wife to use a stolen credit card to get money from an ATM. And assuming she could read, she knew it wasn't theirs. Right, right. And Saunders said that he used the term agency, but this is not a legal act of agency. It was something other than a legal act of agency. But it was, I don't want to use joint criminal, it was some sort of criminal activity, not necessarily a joint criminal enterprise. And the court applied the exception to say that, to the marital privilege. I hope I haven't put you that too terribly. Right, here, so if I follow that argument you're saying here, the fact that she initially just told the police something she knew not to be true, notwithstanding what may have occurred, she could have been charged with obstruction of justice at that point. Which is exactly what the defendant said in attempting to impeach the testimony of Ross, defense counsel said below, in attempting to impeach the testimony of Ross Homerson. He asked the jury, why wasn't she charged with obstruction of justice if she lied at the behest of the defendant? Why wasn't she charged with aiding and abetting the fugitive if she lied at the behest of the defendant? So as far as I'm concerned, that was settled below. All right, the other things about, you know, registering under a fictitious name at the motel. Again, she still doesn't know, from what we know, anything about what really occurred. She doesn't, he hasn't said anything to her other than it was a horrible thing. But she's doing something allegedly at his request, correct? Correct. And regardless of whether it was at his request, defense counsel acknowledges it comes in any way because she did it. She can testify to what she did. The only point in question is whether she can testify, he asked me to do it. And that's a minor, minor part of her testimony. The bulk of her testimony is saying what she did. For example, lying to the police, providing the defendant with a false alibi, driving the defendant to Mexico. All of these things come in regardless of the marital privilege. Counsel, is it your position that all of the conversations between Mr. Hammerson and his wife are admissible? Understanders, yes. Okay, I'm a little perplexed. He calls his wife initially on the day of the murders and says, or the day after the murders, I believe, something terrible has happened, but I can't talk to you about it on the phone. Then he says he heard about the fire at the Lichtmans. How is that not privileged? How does that fall even within a loose agency theory? Something terrible has happened. What does it have to do with a criminal enterprise? Well, number one, that comes in, I think, because the defendant in his pretrial statements to the officers, particularly Officer Randall, said he called his wife on the way to Springfield after he heard about the fire on the radio. So that's already in evidence. So are the people who maintain since that comes? You're saying he waived it? Yeah, that would be waiver. Well, he called her to say that he had heard about this, but did he say to the police officer, I told her something terrible had happened at the Lichtmans, or is that the part that she adds to this equation? The specifics of the conversation, I believe, were added by her, yes. Yes, but he definitely opened the door to that conversation by mentioning it himself. What about the fact that he allegedly said the police might be stopping by? Did he testify that he told her the police might be stopping by? And if he didn't, how is that waived and how is that not a privileged communication? I don't want to confuse the court. He didn't testify in this case. These were pretrial statements he made to the – Right, but did he make any pretrial statements and he alluded to telling her the police might stop by, which could be arguably an inference of a consciousness of guilt. If he didn't tell that to the police, why is that not privileged? I'm not sure. I can't say whether he did or not. I'm going over the testimony in my mind. I think he may have, but you'd have to look at the record. But insofar as her actions could be construed as aiding and abetting a fugitive, the marital privilege would apply. I think you have a strong argument there, but if he's simply telling her something terrible is happening, the police might be coming by, I don't see any criminal – she's just taking a phone call. How could she be in a criminal enterprise when she answers the phone at that point? I think you have a hard sell on that argument. Well, no, he's obviously prepping her for the lies he's going to ask her to tell later. But up to that point, there's no evidence of a criminal enterprise from her standpoint that she's engaged in one with him. I don't think a timeline can be drawn on this issue in Saunders. Regardless of when the wife in Saunders was asked to go to the bank to use a stolen credit card, it doesn't matter exactly when. It's all – the exception applies to all the conversation. So you're saying that if a week later something happens and she acts as an agent, anything that was said from the inception of the case comes in? I think Saunders to be read that broad, yes. But I don't want to lose sight of the fact that there are very, very minor comments that are objected to that can be arguably applied under the marital privilege. Most of the comments are what she did and what she told police. 99% of them are those, and all of those come in regardless. And defense counsel needed these comments to come in. He needed to explain why the defendant fled to Mexico. So it's obviously a strategic choice under Strickland to allow her to testify that the defendant told her, they're going to frame me for this, I've got to go. I mean, that was a strategic choice. So it's immune to any kind of Strickland challenge. I'll concede for purposes of this next question that some of the things are minor statements that are made that he's either opened the door for or she's actually done something that she can testify to, and it's not privileged. But at the very end, what is the point of eliciting from her, and as he walked over the Mexican border he said three little words, not I love you, but goodbye forever. That is very emotional. That is very explosive, even though they're three little words. What's the purpose of that? And how can that be an exception? Well, if the comments previous to that are accepted under Saunders, that comment is accepted under Saunders. I mean, because she was in the process of helping him flee to Mexico. She was aiding and abetting him. He was walking himself. I mean, she was there. She was there. She didn't go into Mexico. He did. You can see this scene from Casablanca, goodbye forever. Sort of a nostalgic. Yes. Very nostalgic, semi-romantic moment of the movie. Right. I'm not sure how to differentiate that comment from any of the others, but the fact of the matter is he did flee to Mexico, and he intended to stay there forever. I mean, we know that because he was picked up in Ixtapa where he had established his own life. I mean. I think that's what we're wrestling with in some of these conversations. You seem to be saying you're acknowledging that if it's a conspiracy or she's acting as an agent, it comes in. It's a plausible argument. But the reference to goodbye forever, which is a powerful acknowledgement, he's not coming back, doesn't seem to fit in with that. But then you seem to be saying, well, if you find that at any point in this chain of events there was some agency or criminal enterprise, that every single conversation before and after comes in. Do you have any authority for that? Well, Saunders, who this Court brought up during the opposing counsel's argument, there's unfortunately not too much authority on this issue. There's a lot of federal authority, but Saunders, as far as I know, is the only state case on point. If I could just say a couple of brief comments on the first issue. Defendant is attempting to pick apart all of the tiny pieces of circumstantial evidence individually. As the Court knows, you have to look at the whole picture of evidence that was presented to the jury. Well, take out Ross' statements and what have you got left? You have defendant was at the house. He rented a van for no apparent reason. He lied about the reason. He complained about the fact that the van was identifiable. He wanted more boxes than the box store could provide him. He was found in possession with the vase. His stories about what he did that day changed and, more importantly, did not comport to the mileage on the van. Whatever he did that day, we don't know, in particular, because the mileage wasn't borne out. He lied about owning a .22 caliber gun. That's huge. At the time, he bought it 20 months earlier. He still had a clip for it. He still had ammunition for it. The ballistic evidence, as I talked about before, matched the casings in class to one another. The ammunition used to murder the victims was a type of ammunition he had in his possession. He purchased gasoline at the approximate time of the fire, parking it in front of one pump and pumping gas out of another pump. And it was not an amount of gas sufficient to fill a van. It was seven or eight gallons. And the gasoline attendant couldn't say whether or not he pumped it in tanks. Half an hour later, Lippman's house was up in flames. Gasoline was used as an accelerant. That's another huge piece. All of what the wife said about what she did comes in, which is a lot. She lied to the police. The defendant himself gave multiple inconsistent statements, and then he fled to Mexico. People had asked that the jury finding of guilty on first-degree murder be undisturbed by this court, and this court affirmed the convictions that were entered on that verdict. Thank you. Ms. Hamel. When I was at preempted half of my rebuttal, I was going to make the point about the fact that the marital privilege, it's not all or nothing. There is no authority for that notion. And I appreciate your noticing the comment that was made when they went into Mexico. I don't think I raised that in my brief, and I thank you. I just want to say that, once again, the state is overstating the quality of the evidence. But now we do have Mr. Psenka's interpretation of that list. We've seen that list ourselves, and we've seen, you know, in the record and in the briefs. That appears to be a rather extensive list. So what you're complaining about is the quality of the evidence in that list, or are you disputing that that evidence actually exists pursuant to this record? Well, I am disputing to some extent that the evidence exists, that there is any significant match made between the casings that were found at the scene or the casing that was found at the scene and the casing that was found in the basement. Again, it gets it down to what type of COLA, but it does not get it down to any specific thing. And to say that they got it down to four or five guns is, again, a gross misrepresentation. Four or five models of .22s. There are hundreds of thousands of .22s that are in this country, and that isn't my guess. That is the testimony of the state's own witness. So what you seem to be saying is the list that he just recited for the court, you're not arguing that this did not come into evidence. Is it fair to say you're arguing the strength of the inference of those items? I'm actually arguing that these inferences, what they actually proved, none of it gave rise to a reasonable inference of guilt other than arguably the evidence of flight, which can be one thing that gives an inference, one thing that could be argued along with other facts. It would never be enough to be proof beyond a reasonable doubt all by itself, and yet it stands virtually all by itself. We don't know what time these people died, so we don't know if the defendant had any opportunity to do it, to commit the crime when his budget van, rental van, was sitting in the driveway. And as far as his purchase of gas at 7-08 at the corner of Route 31 and Route 62, which is a busy intersection on a night in which one of the state's witnesses, a realtor, testified that it was very bad, that the traffic was slow because it was icy and snowy. It's not – he would have – there's a real time problem with him being able to get from that location, 10-minute drive under good circumstances, according to MapQuest, to the Lichtman's home, and then run gasoline around three floors of that very large house and set it off and get out by 7-30, which is the latest, according to the state's witness, again from the alarm company, that this fire could have gone off. We will assess all of those issues. Just very briefly touching on the marital privilege issue again, he raised an interesting point that ties into the argument of ineffective assistance. By defense counsel refraining from asserting the marital communication privilege and allowing – then delving into those conversations regarding the trip and the alleged flight, didn't that benefit the defendant because it allowed the explanation, since he didn't testify, as to why he left the country. He thought he was going to be framed. It wasn't that the central argument of the defense counsel trial as to why he left the United States. So if you can't get those conversations in and he doesn't testify, the jury finds that he ends up in Mexico shortly after the offense. So doesn't that benefit the defendant to be allowed to have her testify as to why they left the country? Well, I don't think that Roz actually testified that he told her that he didn't do it and he was going to be framed. She testifies primarily that he said, I want to get out of this area and then that I want to go to Mexico. Well, actually, across examination by Mr. Weinstein, it was the question, did he ever mention that the police were trying to pin this crime on him? And then the answer was yes. And he told you he was not guilty, and the answer was yes. I apologize. I had forgotten about that. Regardless, even if that is the case, the thing is, the defendant – that inference, if the defense wanted to argue that inference, they could have argued it from Roz's testimony, that, you know, of course he'd want to leave because he would fear being framed or that, you know, he thought he was going to be framed. How could they get it from Roz's testimony if the marital privilege was asserted? Well, they could have got it from her testimony describing the flight because she would be able to testify to that. But the really important thing here is those phone conversations, the fact that she testified that he had a consciousness of, you know, that something terrible had happened and something he couldn't talk about on the phone. If he was simply aware that a customer's house had burned down, he certainly couldn't talk to her about that on the phone. Well, that's the reason we asked opposing counsel the question about that. And you dispute his conclusion that even though ostensibly it would seem that there would be privilege, it's not an all-or-nothing proposition. That's right. You can't reach back and get everything even if at the time she was not acting as his agent. That's your position. I do. I just want to point out this again. This is a very spectacular case. I think that the America's Most Wanted Program's role in this probably put Lake County in a position of absolutely having to go forward with this prosecution whether they felt they had enough evidence or not. I do not believe they had enough evidence. And so we ask you first to reverse these convictions outright simply because the evidence was not sufficient to sustain them. At a minimum, we ask that you recognize that the evidence is so close that these trial errors that I cite altogether or individually were likely to have affected the verdict and, therefore, it should be remanded for a new trial. Thank you, counsel. Thank you. Thank you both for your argument. The case will be taken under-